JUDGE STITES
delivered the opinion oe the court:
In 1838, Samuel Cabell and Louisa Montgomery were married in Green county, in this state, and continued to live together *323 as mail and wife until some time in 1839, when, by mutual agreement, they separated.
By the terms of separation the property which the wife owned before marriage was to be returned to her, and, in addition thereto, she was to be furnished with a riding horse and the sum of one thousand dollars, for the payment of which her husband executed to her two friends, Wakefield and Hoskins, his note, for her use and benefit. It was further agreed, and an instrument in writing to that effect executed by the parties, that either one or both might apply to the legislature of Kentucky for a divorce, and that such divorce might be granted without making provision for the support of the wife, she having been (as is recited in the paper) provided for by her husband in a manner “ satisfactory to her and her friends.”
At the same time Wakefield and Hoskins, who seem to have acted in the matter as the relatives and friends of the wife, covenanted in her behalf and with her assent with the husband that she should assert no claim for dower against his estate at his death, and that they would be answerable to his representatives for any such claim.
In pursuance of this arrangement, Cabell restored to his wife the property she owned before marriage, and paid for her use to her friends the one thousand dollars, which she received. He likewise, at the session of the general assembly 1840-41, presented a petition setting forth the foregoing facts, and obtained the enactment of the following law:
“ Be it enacted by the General Assembly of the Commonwealth of Kentucky, That the marriage contract now existing between Samuel J. Cabell and Louisa H. Cabell, be, and the same is hereby, dissolved; and they are hereby restored to all the rights and privileges of unmarried persons.” {Sess. Acts, 1840-41.)
Mrs. Cabell then assumed the name of Montgomery, and seems to have fully acquiesced in the divorce thus obtained, not only by the instrument of writing she signed, but also by receiving and enjoying the money and property provided for, and with which she expressed herself satisfied — buying and selling property, and acting in every other respect as a feme sole *324 from the date of the enactment up to 1854, when Cabell died— a period of about thirteen years.
Cabell, at his death, left a large estate in land, slaves, and money, all of which he disposed of by will, except two tracts of land.
In April, 1855, Anderson, a son-in-law of Cabell, filed a petition in behalf of his wife, one of the devisees, and in his own right as the purchaser of the interest of Paulina Lackey, another devisee, in the two tracts of land, for the purpose of obtaining a construction of the will, settling the rights of the parties, and a distribution of the estate. To this action he made the administrator with the will annexed, and the devi-sees, parties, and called upon the latter to show what advancements they had received from their testator during his life. He also exhibited a paper purporting to be an account of advancements kept by the testator in his lifetime, and insisted, in his petition, that the two tracts of land which were undevised should be sold, and the proceeds applied to the equalizing of the shares of his wife and Mrs. Lackey, both of whom he charged had received much less than their co-devisees.
The administrator, Carlisle, answered, setting forth his acts as administrator, and also requesting a settlement and determination of the rights of the parties. In his answer, which was made a cross-petition, he alleges that Mrs. Louisa Cabell, who is charged to be a non-resident, claimed dower in the estate, and made her a party, asking that the proper steps might be taken against her, and that the court should determine whether she was entitled or not. Thereupon a warning order was taken, and Mr. Bramlette, a practicing attorney of the court, was appointed to defend for her.
At a subsequent term of the court Mrs. Cabell, by her attorney, filed an answer, in which she charged that she was entitled to dower in the estate, upon the ground that the articles of separation and the legislative divorce were inoperative and void, insisting that as a feme covert she could make no valid contract with her husband, and that the act of the legislature, supra, was unconstitutional. Her answer was made a cross-petition against the devisees and personal representative of *325 Cabell, all of whom responded, insisting npon the validity of the divorce, and denying her right of dower; but praying, in the event she was so entitled, that Hoskins and Wakefield should be held responsible upon their covenant with their testator, and made their answers cross-petitions against them. Hoskins and Wakefield appeared and answered, and denied Mrs. Cabell’s right of dower, but asked that, if an allotment of dower was made, it should be subjected to the payment of any judgment that might be rendered against them as her guarantors in the covenant with Cabell.
Mrs. Lackey, in her answer to the original petition of Anderson, charged that the deed exhibited by him and relied on as passing to him all of her interest of any kind in the two tracts of land, whether as heir-at-law, devisee, or distributee of Cabell, was obtained by fraud on the part of Anderson, saying that it was never intended to pass more than one seventh of the land, and that the original title bond given by her to Anderson was restricted to the one seventh of the land, and did not embrace any interest she might have by way of equalizing her with her co-devisees. Her answer 'was made a cross-petition against him, and prayed to have the deed set aside and vacated. Anderson replied to these charges and controverted them specifically, insisting upon the fairness of the transaction.
The case was referred to an auditor to settle the estate, ascertain its value, and the advancements made to the several devisees; and also to report what amount would be requisite for purposes of equalization between the parties, under the Revised Statutes, (chap. 30, sec. 17, p. 282.)
By the auditor’s report, it seems that the land was worth $ 1,950'; and that about that sum would be necessary to make Mrs. Lackey efual with her co-devisees, she having received less by way of advancement than any of her co-devisees.
Upon final hearing the court decided against both Mrs. Cabell and Mrs. Lackey, and dismissed their cross-petitions. The chancellor also refused to make an allowance to Mrs. Cabell’s counsel, and refused to allow the administrator as much by $400 as he claimed for his services.
*326 Mrs. Cabell complains of tbe judgment because it dismissed ber claim for dower; and her counsel, Bramlette, complains of the order refusing him an allowance. Mrs. Lackey insists that the relief she sought against Anderson was improperly denied; and the administrator, Carlisle, complains that his allowance should have been fifteen hundred dollars instead of eleven hundred.
Whether there is any substantial ground for reversal in behalf of these parties, or either one of them, we will proceed to consider.
But one ground is relied on by Mrs. Cabell, and that is, that the legislative enactment, supra, is unconstitutional and void.
It is contended, 1st, that it is a law impairing the obligation of a contract, and therefore in violation of both the federal and state constitutions, which expressly forbid the enactment of such laws; and 2d, that it was, on the part of the legislature, an exercise of judicial power, and thus violative of article 1, sections 1 and 2, of the State Constitution of 1799, which separates the powers of government into three departments, legislative, executive, and judicial, and forbids either one department from the exercise of powers properly belonging to another.
It has generally been considered by the courts of this country, federal and state, that marriage, though in some respects a contract, is not within the constitutional interdiction of legislative acts impairing the obligation of contracts.
In Dartmouth College vs. Woodward, (4 Wheaton, 518,) Chief Justice Marshall observed that the constitution of the United States had never been understood to restrict the general right' of the legislatures of the states to legislate on the subject of divorces. And a similar view seems to have been entertained by Judge Story, in the same case. This doctrine seems likewise to have been acquiesced in by Chancellor Kent, who concedes “that in ordinary cases the constitutionality of the laws of divorce in the respective states is not to be questioned.” (2d Kent's Com., 108.)
So, in Connecticut, it was held that legislative divorces for cause were constitutional and valid. (8 Conn. Rep., 541.)
*327 We are aware of no case in Kentucky in which this question has been directly raised or decided; but the general doctrine that the marriage contract is not within the constitutional inhibition, has been certainly approved of by this court impliedly, if not directly.
In Maguire vs. Maguire, (7 Dana, 184,) this court, after summing up various considerations distinguishing marriage from ordinary contracts, uses the following language: “ And, therefore, marriage being much more than a contract, and depending essentially on the sovereign will, is not, we presume, embraced by the constitutional interdiction of legislative acts impairing contracts.”
In Berthelemy vs. Johnson, (3 B. Mon., 90,) the power of the legislature to authorize a divorce and dissolution of the marriage contract for cause, when judicially ascertained, is expressly conceded.
And in Gaines vs. Gaines, (9 B. Mon., 308,) in which it was held the legislature could not, by special act of divorce, sought by one of the parties against the consent of the other, affect pre-judicially the rights of property of the latter growing out of, and incident to, the marriage relation, the general power of the legislature over the subject of divorces and the contract of marriage is not only not questioned, but is virtually conceded.
In addition to these almost direct judicial recognitions of the power of the legislature, to some extent, over the marriage relation and contract, and the rights of the parties incident thereto, and in corroboration of the correctness of the doctrine that the power exists, we have had frequent and repeated instances of its exercise under the constitution of 1799, acquiesced in by the executive, and, except in the cases referred to, never called in question.
Every department of government in this State, since the adoption of the constitution of 1799, and up to 1850, seems to have recognized the marriage relation, as has been said, “ as an organic institution, subject to the sovereign power of the State, not like mere contracts, to be dissolved by the mutual consent only of the contracting parties, but to be abrogated by the sovereign will, either with or without the consent of loth *328 parties, whenever the public good, or justice to both or either of the parties, will be thereby subserved,” and to have regarded “ the obligation as created by the public law, subj ect to the public will, and not to that of the parties.”
In view, then, of the almost universal recognition throughout the Union of the power of the State Legislatures over the marriage contract — the repeated exercise of such power by the legislature of this state prior to 1850 — the implied, if not express, recognition of its existence by the courts of the State, so far as any opinion has been expressed — the general acquiescence in the right of the legislature to regulate the relations and rights of husband and wife, and in the absence of any judicial authority in this or any sister state (except in Missouri and Florida) contravening such power, we are not willing to say that the legislature, in the enactment of the divorce referred to, with the assent of the parties, violated the provisions of the federal and state constitutions forbidding laws impairing the obligation of contracts.
With regard to the objection that the enactment in question was an usurpation of judicial authority, and therefore void, we deem it equally untenable.
The act complained of is, it is true, not what can be properly called a rule of action, or, as is said, a public law “ prescribing what is right and prohibiting what is wrong.” It is a special or private act operating on the parties named, and no further. But it is not therefore a judicial sentence, nor is it the less operative as a law to the extent it was designed to go.
Blackstone (1 stvol., 86) says that “ statutes are either general or special, public or private. A general or public act is an universal rule that regards the whole community. Special or private acts are rather exceptions than rules, being those which only operate upon particular persons and private concerns.” And this distinction is still kept up and familiar.
It will not do, therefore, to pronounce an act a judicial sentence, and an usurpation of judicial power by the legislature, because it is special or private in its operation, and its effect is limited to the parties or subjects named, or because the object is attained by the enactment itself. Such a conclusion would *329 be as remarkable in its character as it would be disastrous to a large portion of the local and special legislation which abounds in our statute books. There can be as little doubt of the power of the legislature to enact special as general laws. Both, when not in violation of the constitution, are equally valid.
But it is earnestly contended, that because this enactment dissolves the marriage contract, it is necessarily an assumption of power by the legislative department to do that which the judicial department alone could do; and the cases of Maguire vs. Maguire, and Gaines vs. Gaines, supra, are referred to with confidence as authority upon this point.
We have already seen that the case of Maguire vs. Maguire concedes in terms that the contract of marriage is not within the constitutional prohibition of laws impairing contracts, but is subject to the legislative will; and it seems to us that nothing is said in the case which will warrant the conclusion contended for on this branch of the question.
After discussing the character of the marriage contract, and concluding that the “ obligation is created by the public law and subject to the public will,” the opinion proceeds to say: “ So far as a dissolution of a marriage by public authority may be for the public good, it may be the exercise of a legislative function ; but so far as it may be for the benefit of one of the parties, in consequence of a breach of the contract by the other, it is undoubtedly judicial. And when thus altogether judicial, it may be beyond the authority of a Kentucky legislature, which, under our state constitution, cannot exercise any power clearly and purely judicial.”
Now to what extent the public may have been benefited, or how far the legislature may have regarded the public good promoted by the act in question, is an inquiry we need not pursue. It is enough to know that that body, in the exercise of its wisdom and discretion, enacted the law, and the presumption exists that they were satisfied that to some extent it had or would have that effect; and where an act of the legislature is not interdicted by the fundumental law of the land, it is not for this department of the government to say that there was no necessity for the enactment, or that it was not promotive to *330 some extent of the public good. Be this as it may, and it is not important to the present inquiry, it is sufficient for our purpose that the facts of this case do not bring it within the principle laid down.
It is obvious that the enactment was not “ for the benefit of one of the parties, in consequence of a breach of the contract by the other.” It was procured with the assent of both, for the benefit of both, and both acquiesced in it, for many years enjoying rights and privileges which they could not have otherwise been allowed. It does not appear that the act was in consequence of a breach of the contract; and no feature is presented which, under the rule quoted, would make the dissolution enacted by the legislature a judicial act.
The case of Gaines vs. Gaines, supra, presented a state of fact dissimilar in many important features to this.
There a proceeding by cross-bill had been commenced by the husband for a divorce, and it was strenuously resisted by the wife. Pending the action, the husband, against the consent of the wife, applied to the legislature and obtained a legislative divorce. This act of the legislature was exhibited by him in an amended answer, and before the tei’mination of the suit he died. The wife, then widow, asserted claim to dower, and relied that the legislative divorce thus obtained against her consent, and whilst a court of competent jurisdiction had cognizance and control over the controversy, was an unconstitutional assumption of power by the legislature, and void. So the circuit court held, and its decision was approved by this court.
The question in the case, as stated by the court, was “ not simply whether the legislature may, under any circumstances, constitutionally enact that A. be divorced from B., but whether, when it is manifest that a party, ‘after having sought g divorce in a judicial tribunal, and while his suit is there pending, abandons that forum and resorts to the legislative power, for the sole purpose of affecting and defeating the legal and equitable rights of his wife in his property, the divorce granted by the legislature on such application, can, without disregarding the division of powers and distinction of departments as established by the constitution, and the security of private *331 rights of contract and of property therein granted, be considered as affecting to any extent the rights of property involved in the question of divorce.”
Upon this question the court, after discussing it at length, came to the following conclusion:
“We are of opinion, therefore, that whatever power; to be exercised in view of the public good the legislature may have to enact divorces in special cases, as it cannot, even for the public good, change the right of private property from one to another without compensation, much less can it do so by a special act of divorce sought by one of the parties against the consent of the other, with the purpose, or effect of operating upon the rights of property incident to the marriage relation, as created and sustained by the general laws applicable to that relation. And the wife having taken no advantage of any privilege afforded by the divorce, she is in no manner precluded from contesting its operation.”
It will be perceived, from an examination of the opinion, that it nowhere controverts the power of the legislature to enact a special act of divorce when it is founded upon the mere will of the legislature, without reference to the breach of any existing contract or law. The conclusion rests mainly upon the fact that the legislature, in that particular case, undertook to oust the court of its jurisdiction, and, without the consent and against the will of the wife, granted the husband a divorce, and thus attempted, in effect, to deprive her of her property without compensation. The question as to the power of the legislature to enact a special act of divorce, without reference to the breach' of a contract or law, is left precisely as it stood in Maguire vs. Maguire, and the principle there stated may be therefore regarded as having been acquiesced in — at any rate, not denied.
Now, the inquiry comes, is there any feature of the case under consideration that brings it within the rule laid down in Gaines vs. Gaines ?
The enactment in this case is made without reference to the breach of any existing contract or law; for it does not appear that either party had been guilty of a breach of conjugal or *332 legal duty, or of any of the obligations of the marriage contract. On the contrary, as appears from the facts stated, the separation was the voluntary act of both, not superinduced by maltreatment or misconduct of either; and its terms satisfactory, not only to both parties, but approved of by the friends and advisers of the wife. The divorce, or the special act complained of, was not procured against the will, or without the consent of the wife, but in accordance with her will and with her consent. Nor can it be said that she was deprived of her property without compensation; for she was compensated, and, as she then and subsequently admitted, in a manner entirely satisfactory to herself and friends.
There is wanting in this case every material ground upon which the decision in that rested; and not only so, but there is a feature in this which was not in that, and which, had it been, would, as the court clearly intimate, have sufficed to defeat the claim of the wife. We allude to the fact that Mrs. Cabell took advantage of the separation and divorce in this case, and enjoyed rights and privileges thereunder which she could not have enjoyed otherwise. As the agreed facts show, she received the property and money stipulated to be paid her, resumed her previous name, removed from the state, did business, and bought and sold real estate, and in every other respect enjoyed all the rights and privileges of a feme sole. The enjo3unent of these rights for a period of about thirteen years, together with her written assent to the obtention of the divorce, shows conclusively that she acquiesced in it; and, having availed herself of all the advantages afforded by the divorce, a court of equity should not at such a late day listen to her application for relief. This court, in Gaines vs. Gaines, assign as one of the grounds for affording relief to the wife, that she had taken “ no advantage of any privilege afforded by the divorce,” and was, therefore, not precluded in any manner from contesting its operation. The attitude of Mrs. Cabell is wholly different, and she is, and ought to be, precluded in a court of conscience from questioning the validity and operation of a legislative divorce brought about with her express assent.
*333 Our opinion, therefore, is, that her demand for dower was rightfully dismissed.
Nor was there error in refusing the allowance asked for by Mrs. Cabell’s attorney.
It is true the Civil Code (sec. 440) provides for the appointment of an attorney for a non-resident defendant, and albo directs that he shall receive a reasonable compensation for his services, to be paid for by plaintiff, and taxed in the costs. But, it seems to us, that the compensation thus provided for is for services rendered as the officer of the court, in obedience to its appointment, and not for such as may be rendered under a contract for compensation made with such non-resident.
The duty of such attorney is prescribed. It is, in the language of the Code, to inform the non-resident defendant, or the party constructively served, of the pendency of the action, and of such other matters as may be useful to him in preparing for his defense. Now, suppose upon the receipt of such information the party defendant should employ the attorney, and undertake by special contract to compensate him for his services, or should compensate him in advance; or, suppose that, in view of the uncertainty of the right of the non-resident defendant, the attorney should stipulate with him for a large contingent fee, and, in either state of case, should vigorously prosecute his claim, or resist the relief sought, and fail of success, could it be with propriety said that services rendered under such circumstances were in obedience to an order of the court, and in discharge of its commands, and that they should be paid for by an allowance to be taxed against the plaintiff? We think not.
The section, supra, is, in our opinion, merely directory, and was intended to provide for compensation when not provided for by the party in whose behalf the appointment is made; but not where it is made to appear that the attorney, though appointed by the court, is really acting under a contract for pay from the non-resident, and looks to him for compensation.
Here Carlisle (a competent witness, though administrator) proves that the attorney of Mrs. Cabell had informed him, just before the suit was brought, that he and his associate, Mr. *334 Cravens, were preparing to bring suit for dower for Mrs. Cabell, and states that he believed the services were rendered under a contract with her, and that he (Carlisle) could prove by Cravens, if he would testify, that the services were rendered under a contract with Mrs. Cabell. Pie also, as appears from the bill of exceptions, asked the aid of the court to compel Cravens to testify in relation to the contract; but he refused, and the court declined to compel him, but refused to make the allowance; and we think properly. The court had the right to assume, from the facts stated in the affidavit, that the attorney had been employed by Mrs. Cabell, and looked to her for pay, and it devolved upon the party applying for the allowance to show that such was not the case, or at least to deny the allegation made in the affidavit. The burden was then upon him to repel in some way the presumption arising from the affidavit, and, having failed to do so, the motion for the allowance was properly overruled.
Nor can we say that the allowance to Carlisle, as administrator, was too small. It does not appear that he had any extraordinary trouble, considering the magnitude of the estate. It is true that five per cent, is generally allowed, but not universally. The allowance is within the discretion of the court, and the amount is always proportioned to the service; and where such discretion has not been obviously abused, this court will not disturb it. In this case we think there has been no such abuse of discretion, and we are, therefore, inclined to let the allowance of eleven hundred dollars stand.
We cannot concur, however, with the chancellor in his refusal to grant Mrs. Lackey the relief asked for against Anderson.
In our opinion, the facts fully warrant the conclusion that she was overreached wrongfully in the transaction between herself and her brother-in-law, and that the deed should have been set aside and vacated.
What are the facts ? Samuel Cabell, her father, lived and died in Green county. His death occurred in 1854, and his will was admitted to record in March, of that year. Mrs. Lackey at the time lived in Lincoln county, and had not been *335 in Green since the death of her father; and Anderson, her brother-in-law, whose wife was a co-devisee, lived in Green. It was obvious that, as to the land mentioned, the testator died intestate; and also, that, under the existing law, so much of the land, or its proceeds, as might be'necessary to equalize the devisees, would go to those who had received less than the others.
In February, 1855, Anderson went from Green to Lincoln, a distance of about sixty-five miles, and proposed to buy, and did buy of Mrs. Lackey, her interest in the land and its proceeds, for the price of two hundred and fifty-five dollars and seventy-five cents, which sum, estimating that she was only entitled to one seventh of the value of the land, was at the rate of about five dollars an acre. This sale, as the witness, Gabriel Lackey, proves, was by title bond and on a credit of four months. In the course of five or six days Anderson again went to Lincoln, paid Mrs. Lackey the money, gave up or destroyed the bond, and demanded that she should execute a deed which he brought with him. This deed was executed and acknowledged before the clerk of the Lincoln county court, on the 2d March, and on the 10th April following was lodged for record in the proper office in Green. The deed is explicit as to the interest conveyed. It says: “ All the right, title, interest, and claim which I have or may in any event be entitled to, as heir, devisee, or distributee of Samuel J. Cabell, deceased, in and to the following two tracts of land, &c.”
On the same day that the deed was lodged for record in Green, Anderson, in behalf of himself and wife, brought his suit for a settlement and distribution of Cabell’s estate.
In his petition, as we have seen, he sets forth and exhibits the will; sets out in detail what advances each devisee had received from the testator in his lifetime, as shown by a paper or account in the testator’s hand-writing, whichhe says hadbeen furnished him by the administrator with the will annexed; states that Cabell had died intestate as to the tracts of land; alleges that his wife and his sister-in-law, Mrs. Lackey, had received much less than their co-devisees; shows by the paper referred to that Mrs. Lackey had received but little over five hundred *336 dollars, and claims her entire interest in the proceeds of the land under his deed, or whatever may be necessary to make her equal with her co-devisees. And the result of the controversy between himself and Mrs. Lackey is, that he succeeds in obtaining from her, by the decree complained of, about nineteen hundred dollars for an outlay of only two hundred and fifty-five!
Now we think it evident that Anderson, when he went to Lincoln, was fully apprised of the extent of Mrs. Lackey’s interest in the land, and induced her by some means or other to believe that it did not exceed one seventh of the value of the land; and further, that she, relying upon him with confidence, was wrongfully induced to part with her whole interest without knowing what it was.
What motive could have prompted him to go to the expense and trouble of a trip to Lincoln for the purpose of buying one seventh of the land at about its actual value? It certainly was not a regard for the interest of his sister-in-law. This is manifest from the tenacity with which he clings to the entire interest in the land. It is hardly credible that he had not advised himself thoroughly of her rights. His wife was a co-devisee. He lived in Green, where the testator died and the will was recorded; had ample means and opportunity to know the character of the will, and to have informed himself of the extent of the advancements to the several devisees, and, as may be rationally inferred from the promptitude with which his petition was filed, (setting forth every material fact concerning the estate and the extent of his interest and that of Mrs. Lackey,) had, long prior to his purchase, informed himself of the extent of her interest, and well knew it when he bought.
If he only believed he was buying one seventh in value of the land, why so solicitous about a deed, and so hurried in paying up the money? If the title bond had been as compi’ehen-sive in its terms as the deed, what reason could have existed for such trouble and haste in converting the bond, which was ample evidence of the sale, into a formal deed ? The bond was as effectual for all reasonable purposes to divest Mrs. Lackey of her interest and invest him with it as the deed. *337 And why was the bond of such little value, as he remarked to Gabriel Lackey ? It is certainly unusual for men to take such trouble in transactions that are supposed to be only ordinarily profitable, and not customary for purchasers of property on a credit, to ride such distances as Anderson did, in so short a time, merely for the purpose of advancing money not due and obtaining a deed in place of a title bond for an undivided and uncertain interest in land. The only rational solution of such unusual solicitude and haste is, that he knew what interest Mrs. Lackey really had, and was not satisfied, upon his return home, that the terms of the title bond were sufficiently comprehensive to embrace it; but to place the matter beyond doubt, employed a lawyer to write a deed, and returned without delay to procure its execution, upon the pretence that the bond was invalid and of paying the money which was not then due.
The evidence is ample that Mrs. Lackey only intended to sell him one seventh of the land or its proceeds, and that she believed that to be all she was entitled to.
Gabriel Lackey proves how the price of $255 75 was arrived at. The number of acres in both tracts was estimated at $5 per acre, and the aggregate divided by seven. This fact is also apparent from the number of acres and the price given, and is pregnant with meaning. Why make an estimate of the number of acres at a fixed price in order thus to ascertain the interest of each devisee, if it was uncertain the devisees would be equally interested ? Why divide the aggregate by seven when it was known that several of the devisees had received far more than the others, and would be entitled to no portion of the land ? What could have suggested this mode of estimating Mrs. Lackey’s interest, except the belief on her part, superinduced by her confidence in her brother-in-law and his statements, that one seventh was the extent to which she was entitled ?
Gabriel Lackey proves that Anderson told her what Hancock had agreed to give Frederick Cabell for his seventh, and furthermore proves that all that was sold was one seventh of the land. His testimony is certainly competent to show fraud or mistake in the obtention of the deed or its execution.
The fact that Mrs. Lackey was silent when Anderson stated *338 in her presence, and that of her son and the clerk, how he understood the contract, presents no obstacle to the conclusion at which we have arrived. It only shows an overweening anxiety on the part of Anderson to provide himself with an implied admission in the event of a controversy about the deed, which was no doubt anticipated by him. If she believed, as we do not doubt she did, that she was only entitled to one seventh of the land or its proceeds, and that she was selling the full extent of her interest, she might readily and properly have acquiesced in the statement. The wrong was in deceiving her as to the extent of her interest, and in procuring from her by that means more than she ever intended to convey.
It seems to us, therefore, that the chancellor should have set aside the deed from Mrs. Lackey to Anderson, and, after first refunding out of the proceeds of the land to Anderson the amount he paid to Mrs. Lackey, have ordered the remainder of such proceeds, or so much thereof as was necessary to equalize her with her co-devisees, to be paid her; and that, in refusing so to do, he committed an error prejudicial to her rights.
Wherefore, the judgment dismissing the petition of Mrs. Louisa Cabell, and overruling the motion to make an allowance to her attorney, is affirmed; and the order making the allowance to the administrator is also affirmed; but the judgment dismissing Mrs. Lackey’s petition against Anderson is reversed, and cause remanded with directions to set aside and vacate the deed of March, 1855, from Mrs. Lackey to Anderson, and for further proceedings not inconsistent with this opinion.
The administrator and devisees of Cabell will be entitled to their costs in this court against Mrs. Cabell, and Mrs. Lackey to her costs against Anderson, but no costs should be charged .against Carlisle or Bramlette.